OPINION
KAREN NELSON MOORE, Circuit Judge.
The National Labor Relations Board (“NLRB”) concluded that the Petitioner, DTR Industries, Inc. (“DTR”), violated the National Labor Relations Act (“NLRA”) when attempting to dissuade its employees from unionizing. DTR seeks review of two parts of the NLRB’s order. First, DTR asserts that Executive Coordinator Thomas King’s (“King’s”) statements to employees were objective predictions, not threats of layoffs should employees unionize. Second, DTR argues that the NLRB incorrectly credited employee Daniel Gahman’s (“Gahman’s”) testimony when concluding that DTR threatened to discipline Gahman for his pro-union activities and gave Gah-man the impression that DTR was surveil- *489 ling his union activities. The NLRB filed a cross-application for enforcement of the order. For the following reasons, we ENFORCE the NLRB’s order.
I. BACKGROUND
A. Factual Background
DTR manufactures hose and rubber anti-vibration products for use in automobiles. DTR employs approximately 800 individuals at its Bluffton, Ohio facility. DTR is a “just in time” operation, manufacturing only the quantity purchased by a buyer and not producing excess parts for inventory. Joint Appendix (“J.A.”) at 508-09 (Dee. 18, 2003, NLRB Hr’g Tr., King Test, at 467:4-468:20). Additionally, DTR is a sole-source supplier for three-fourths of its customers, with those customers relying entirely upon DTR for the production of a given product.
In summer 2002, some DTR employees began a union-organizing campaign. Gah-man, a union supporter, was involved in that effort to obtain union representation. Shortly after the organizing campaign began, DTR management made its disapproval of his activities clear to Gahman. In early August, Gahman’s supervisor told Gahman that he was required to attend a meeting with King and several other supervisors. King, DTR’s Executive Coordinator, reports directly to DTR’s president, COO, Chairman, and CEO. King is responsible for DTR’s human resources and had been with DTR for over a decade as of 2003.
According to Gahman’s testimony, at the meeting King informed Gahman that King was aware of Gahman’s support of unionization and knew Gahman attended union meetings. In addition, King made it clear that he knew about several things that Gahman had mentioned at a union meeting the night before; King’s knowledge left Gahman feeling spied upon and feeling as though he “was being betrayed by the UAW.” J.A. at 223 (Dec. 17, 2003, NLRB Hr’g Tr., Gahman Test, at 183:9). Specifically, King accused Gahman of sharpening a knife for an employee in exchange for the employee signing a union card. But Gahman explained that he sharpened the knife as a favor for the employee while explaining the benefits of unionization. Next, King said that he had heard that Gahman refused to install a fan for an employee who did not support the union. Gahman, however, responded by stating he installed fans whenever there was a work order. Gahman testified that at the conclusion of the meeting King stated that if he continued to hear about Gahman’s union support, King would discipline Gahman for the knife and fan incidents. Gahman said that he would discontinue his union support and “that there won’t be no further problems.” J.A. at 223 (Gahman Test, at 183:22-23).
After the meeting with Gahman, DTR continued to make its disapproval of unionization clear to its employees. King’s public comments regarding the effects of unionization are the primary focus of this case. DTR conducts monthly President Associates (“PA”) meetings where management discusses company issues with its employees. On August 29, 2002, King used one of those PA meetings to address the possible effects of unionization. Although there is no transcript or recording of King’s statements, the administrative law judge (“ALJ”) and the NLRB credited the testimony of several employees who heard King’s comments. DTR employee James Lehman (“Lehman”) testified that King stated that the employees “had the right to choose whether we want[ed] third party representation or not but there was some facts he thought we needed to know.” J.A. at 72 (Dec. 16, 2003, NLRB Hr’g Tr., Lehman Test, at 33:8-10).
*490 Rita McVetta (“McVetta”), another DTR employee, testified on direct examination that King explained DTR’s status as a sole-source supplier. According to McVet-ta, King stated “that if we got [a] Union into the plant that they wouldn’t probably do business with us and we wouldn’t have jobs.” J.A. at 54 (Dec. 16, 2003, NLRB Hr’g Tr., McVetta Test, at 15:22-24). On cross examination, McVetta stated that King made it clear at the PA meeting that “[i]f we had a Union in there[,] customers would not want to deal with us because of the Union.” J.A. at 63 (McVetta Test, at 24:13-14). On cross examination, Lehman corroborated McVetta’s recollection of the PA meeting; according to Lehman, King stated “that if Honda or Toyota or any other customer became concerned about reliability of DTR’s production flow, ... those customers would look for other sources.” J.A. at 76 (Lehman Test, at 37:6-8). Lehman’s impression was that King wanted employees to know that unionization might threaten DTR’s reliability, lead to a loss of business, and ultimately force job cuts.
Gahman also testified about King’s comments at the PA meeting. On direct examination Gahman summarized King’s statements:
[King] explained to us that we had a sole supplier deal going with some of our customers where we were the only company that made particular parts for them, and said that if the UAW was to get into DTR that we would lose that sole supplier status be-, because the companies would no longer feel confident with us being their only supplier because the UAW would make us more unreliable.
And so they would allow other companies, you know, to compete with us for some of the parts that we were making. And he stated that if that happened it would result in layoffs and DTR had never laid anyone off he said [ ], in the time that they’d been a company, but if the UAW came there that that policy would, would have to change.
J.A. at 225 (Gahman Test, at 185:3-15). On cross-examination, Gahman stated that King expressed his concern “about action the customers might take” should DTR become unionized. J.A. at 275 (Gahman Test, at 235:13-14).
Subsequent to these events, DTR terminated Gahman for submitting a false sample for a drug test. DTR conducts random drug tests of its employees, and company policy dictates that DTR terminate any employee who returns a fraudulent sample. In September 2002, Gahman was selected for drug testing; the first sample he provided was brown-colored and undersized, so it was discarded, and DTR requested that Gahman produce another. Gahman’s second sample was a bright col- or and was not warm enough, but the lab sealed and kept the sample. DTR requested that Gahman provide a third sample before a witness at the hospital, and this sample tested positive for marijuana. The second sample was tested and the lab concluded that the sample was “not consistent with normal human urine.” J.A. at 6 (NLRB Order at 6).
B. Procedural Background
On the basis of these and other incidents, the union filed charges with the NLRB against DTR on September 30, 2002.[1] After a three-day trial, on April 9, *491 2004, the ALJ issued an opinion holding that DTR violated 29 U.S.C. § 158(a)(1) by creating the impression that its employees were under surveillance, threatening employees with discipline if they continued to support the union, and threatening employees with layoffs if DTR unionized. The ALJ also concluded that DTR violated 29 U.S.C. § 158(a)(3) for improperly terminating Gahman.
The NLRB affirmed the ALJ’s conclusion that DTR had violated 29 U.S.C. § 158(a)(1) by creating the impression that its employees were under surveillance, threatening employees with discipline if they continued to support the union, and threatening employees with layoffs if DTR unionized. In reaching this conclusion, the NLRB distinguished the previous DTR case, DTR Industries, Inc. v. NLRB, 39 F.3d 106 (6th Cir.1994), and concluded that King’s statements were not protected speech. However, the NLRB reversed the ALJ’s finding that Gahman was wrongly discharged. Because Gahman’s second urine sample was found to be fraudulent, the NLRB concluded that DTR’s dismissal of Gahman was consistent with DTR’s policies.
The NLRB issued its order on September 7, 2007, and DTR timely filed a petition for review. On October 12, 2007, the NLRB filed a cross-application for the enforcement of its order.
II. ANALYSIS
A. Standard of Review
Although the NLRB must have “more than a mere scintilla of evidence” supporting its decision, we review the NLRB’s decision deferentially; “[t]his Court reviews the NLRB’s factual determinations, and its application of the law to a particular set of facts, for substantial evidence.” ITT Auto. v. NLRB, 188 F.3d 375, 384 (6th Cir.1999). “[A]s long as the record as a whole contains substantial evidence supporting the NLRB’s findings, this Court must sustain those findings even if we might have reached a different conclusion upon de novo review.” Id. Substantial evidence “means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).
B. King’s Statements
The primary question on appeal is whether King’s statements at the PA meetings were impermissibly coercive in violation of 29 U.S.C. § 158(a)(1) or whether the statements constituted protected speech under 29 U.S.C. § 158(c). Section 158(a)(1) makes it “an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the” employees’ rights to self-organization and collective bargaining. 29 U.S.C. § 158(a). Section 158(c) protects “[t]he expressing of any views, argument, or opinion, or the dissemination thereof,” but only if the “expression contains no threat of reprisal or force or promise of benefit.” 29 U.S.C. § 158(c). The NLRB concluded that King’s statements “threatened employees with job loss in violation of’ § 158(a)(1), and we agree. JA. at 1 (NLRB Order at 1).
DTR asserts that King’s statements were not threats but were instead simply objective predictions of what would happen should DTR employees succeed in unionizing. Although the Supreme Court has made it clear that § 158(c) protects objective predictions, the Court also has stressed that any such predictions must be carefully phrased lest they erode into unsubstantiated threats:
Thus, an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not con *492 tain a ‘threat of reprisal or force or promise of benefit.’ He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer’s belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.
NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (citation omitted) (emphasis added). Section 158(c) was intended to allow free debate about unionization in the workplace, but it is not so permissive as to allow coercive, threatening speech. Chamber of Commerce v. Brown, — U.S. -, 128 S.Ct. 2408, 2413-14, 171 L.Ed.2d 264 (2008).
Because of the unique relationship between employer, employee, and union, the scope of protected employer speech in the labor setting is limited: “Thus, an employer’s rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) and the proviso to § 8(c).” Gissel Packing, 395 U.S. at 617, 89 S.Ct. 1918. As the Supreme Court has explained, in assessing the scope of permissible employer expression, “any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.” Id. This balancing must “recogniz[e] that what is basically at stake is the establishment of a nonpermanent, limited relationship between the employer, his economically dependent employee and his union agent,” as opposed to “the election of legislators or the enactment of legislation whereby that relationship is ultimately defined and where the independent voter may be freer to listen more objectively and employers as a class freer to talk.” Id. at 617-18, 89 S.Ct. 1918. Therefore, while certain statements may be innocuous in many settings, when made during an effort to unionize those same statements may take on another character entirely. “In reviewing Company statements made in the emotion of a union drive, the Board reasonably considers the effect of the remarks from the point of view of those whose livelihood may depend on them.” Indiana Cal-Pro, Inc. v. NLRB, 863 F.2d 1292, 1299 (6th Cir.1988). Statements threatening plant closure or layoffs are particularly suspect because “threats of plant closure are ‘among the most flagrant’ of unfair. labor practices.” Id. at 1301 (quoting Gissel Packing, 395 U.S. at 611 n. 31, 89 S.Ct. 1918).
Applying the Gissel Packing standard, we must consider whether King’s statements, taken as a whole, were carefully phrased predictions on the basis of objective fact, or contained “a threat of retaliation based on misrepresentation and coercion.” Gissel Packing, 395 U.S. at 618, 89 S.Ct. 1918.[2] Although some of King’s *493 statements contained predictions of what DTR’s customers would do if DTR unionized, these predictions were not “carefully phrased on the basis of objective fact.” Gissel Packing, 395 U.S. at 618, 89 S.Ct. 1918. Considered in context, and given King’s explicit statements that DTR would have to change its no-layoff policy and that DTR employees would lose them jobs, the statements as a whole had a “reasonable tendency” to be “coercive in effect.” NLRB v. Pentre Elec., Inc., 998 F.2d 363, 369 (6th Cir.1993) (quoting Peabody Coal v. NLRB, 725 F.2d 357, 363 (6th Cir. 1984)), overruled on other grounds by Holly Farms Corp. v. NLRB, 517 U.S. 392, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996).
According to DTR, King’s statements were objective predictions because we previously held that similar statements made by DTR’s president were objective predictions not containing impermissible threats. In 1989, during a prior unionization push at DTR, company president Yuji Kobaya-shi (“Kobayashi”) sent a four-page letter to employees explaining his views regarding the effects of unionization. His letter included the following statement:
Our business would automatically be reduced if the union wins the election and our customers took away 50 percent of our sole source business. They could, of course, take it all away and sole source with some non-union company. They do not have to give any business to DTR.
Furthermore, most labor contracts are for three year terms. The U.S. auto companies force their unionized suppliers to build a 90-day inventory of parts before any labor contract termination. If the supplier fails to do so, it usually loses its order. That means that unionized suppliers, such as our associate Norbalt, are required to work overtime before the end of every labor contract and then, if the contract is negotiated without a strike, employees are laid off while the inventory is used.
Point 3 really comes down to this. Bringing a union would lose business for DTR....
DTR Indus., Inc., 311 NLRB 833, 833 (1993) (quoting letter from Kobayashi to DTR employees (Nov. 10, 1989)). The letter went on to conclude:
Having a union will hurt our business and our chances for success. We will lose some or all of our sole source business and create the danger of losing the confidence of our customers. Let us show what DTR and its associates can do together as a team without the union. You have our attention and our commitment. We will listen and we will respond and we will have a mutual commitment to each other.
DTR Indus., 39 F.3d at 109 (quoting letter from Kobayashi). Kobayashi’s letter to DTR employees certainly bears some similarity to King’s statements at the PA meetings.
When we previously considered the effect of Kobayashi’s letter, we concluded that the letter was an objective prediction. We first observed that “there is a distinction between ‘threats’ motivated by union animus and ‘predictions’ about the probable economic consequences of unionization; the former clearly violates section 8(a)(1), *494 while the latter may be protected by section 8(c).” Id. at 113 (footnote omitted) (quoting Pentre Elec., 998 F.2d at 369). We then concluded:
[T]he Kobayashi letter, taken in context, is an objective prediction of what the petitioner’s customers would do in the event the union prevailed, and thus is protected speech. Kobayashi explained in the communication that companies that sole-sourced with the petitioner were likely to split their business in order to have an alternative supply source in the event of a strike. As Pentre Electric demonstrated, Kobaya-shi was entitled to make this statement based on his industry experience and his knowledge of the petitioner’s customer base, at which point it was incumbent on the Board to prove its falsity.
DTR Indus., 39 F.3d at 114. Although we determined that Kobayashi’s letter was protected speech, that conclusion does not compel us to find that King’s distinct statement is also protected.
Kobayashi and King, despite the vague similarities between what they said, did not make identical statements, and their statements were made in different contexts. Although both Kobayashi and King explained the nature of DTR’s sole-source-supply business and expressed the view that DTR’s customers might not be happy with a unionized DTR, the similarities end there. Not once did Kobayashi’s letter state that layoffs or plant closures were an inevitable outcome of unionization.[3] Explaining the importance of sole-source customers to DTR’s business, Kobayashi made the tautological point that “[o]ur business would automatically be reduced if the union wins the election and our customers took away 50 percent of our sole source business.” DTR Indus., 311 NLRB at 833 (emphasis added). It is notable that Kobayashi did not follow this by saying that layoffs would ensue. Even if layoffs were the eventual byproduct of unionization, Kobayashi’s letter was predicated upon the necessary condition of customers taking away 50 percent of the sole-source business, something that Kobayashi did not guarantee. When discussing how automakers have required unionized suppliers such as Norbalt to build up supply prior to the end of labor contracts, Koba-yashi stated that other companies have typically laid off employees while the excess supply was depleted. However, this was a factual statement and not a threat; as the dissent acknowledges, this experience would lead to layoffs only “if other companies’ experience was any guide.” Dissenting Op. at 501. Kobayashi did not go so far as to say that DTR would lay off employees. In fact, Kobayashi closed his letter by expressing his desire for “DTR and its associates” to work “together as a team” and describing the “mutual commitment to each other.” DTR Indus., 39 F.3d at 109 (quoting letter from Kobayashi).
Kobayashi’s letter, by not promising layoffs at DTR, is different than King’s statements to employees at the PA meetings. McVetta, Lehman, and Gahman all agreed that the import of King’s statement was that unionization would lead to job layoffs. Contrary to the dissent’s assertion that King “did not guarantee that layoffs would result from unionization,” Dissenting Op. at 502, King specifically stated that increased competition “would result in lay *495 offs” and that, “if the UAW came there [DTR’s no-layoff| policy would, would have to change,” J.A. at 225 (Gahman Test, at 185:12-15). McVetta also recalled King’s statement “that if we got [a] Union into the plant that they wouldn’t probably do business with us and we wouldn’t have jobs.” J.A. at 54 (McVetta Test, at 15:22-24). Thus, the tenor of King’s statements was different than Kobayashi’s. Unlike Kobayashi, King explicitly stated that a decrease in business as a result of unionization would be dealt with through layoffs at DTR.[4]
In addition to the fact that King explicitly raised the spectre of DTR layoffs while Kobayashi did not, another key distinguishing feature is the context of these statements. First, Kobayashi was president of DTR, while King was an Executive Coordinator, DTR’s chief human-resources officer. Although Executive Coordinator may in fact be an important position at DTR, the NLRB distinguished King and Kobayashi by noting that Kobayashi’s privileged position at the company gave him “industry experience and knowledge of [DTR’s] customer base,” while King’s statement lacked such context. J.A. at 2 (NLRB Order at 2). In other words, King’s tenure at DTR says nothing to employees about his ability to know whether layoffs would be an economic necessity. As one NLRB Chairman noted, “there are ways, other than layoffs, to deal with drop-offs of business,” J.A. at 2 (NLRB Order at 2 n. 14), but the record does not suggest that King was in a position to assess the viability of alternative measures. As chief human-resources officer, King’s statements could reasonably have been viewed by employees as indicating that DTR would deal with a decline in business through layoffs or other labor-related options, increasing the threatening quality of the statements. Although King may have known about Kobayashi’s prior statements and the ensuing NLRB litigation, there is no indication that any of this knowledge was expressed to the employees. As the Supreme Court has stated, “the Board could reasonably conclude that the intended and understood import of that message was not to predict that unionization would inevitably cause the plant to close but to threaten to throw employees out of work regardless of the economic realities.’’ Gissel Packing, 395 U.S. at 619, 89 S.Ct. 1918 (emphasis added). If the person making the statements threatening layoffs is not seen as in a position to know the economic realities of the company, then the threat is made regardless of the company’s economic realities. While it is true, as the dissent observes, that we found statements of lower-level supervisors to be protected in the earlier DTR case, we emphasized that these statements “merely repeated the observations made in Kobayashi’s letter,” DTR Indus., 39 F.3d at 114, and therefore were taken in the context of the objective facts and predictions already provided by DTR’s president.
While Kobayashi no doubt knew the economic condition at DTR, King’s statement was made “without objective facts for actually believing[] that plants might close if employees voted in the union.” ITT Auto., 188 F.3d at 386. “In the present case, no objective evidence was presented by the Company supporting a statement that unionization would result or even could result in an objectively required economic closing of the plant. Indeed, the Company failed before both the ALJ and the Board *496 to support such a statement as based in fact.” Indiana Cal-Pro, 863 F.2d at 1298-99 (holding that the NLRB possessed substantial evidence supporting the conclusion that a supervisor violated § 158(a)(1) when he told employees that he heard from ownership that unionization would lead to the owners shutting down the plant). Further, King provided no objective facts to explain why layoffs, rather than alternative measures, would be a necessary consequence of a decrease in business. Without this objective support, employees could reasonably view this choice as a threat of reprisal. Combined with King’s lower position at DTR, his failure to provide objective facts to support his statements leads to the conclusion that “their ... reasonable tendency is coercive in effect.” Pentre Elec., 998 F.2d at 369 (alteration in original) (quoting Peabody Coal, 725 F.2d at 363).[5]
In addition to asserting that our prior holding in the earlier DTR case protects King’s statements, DTR encourages us to apply Pentre Electnc to conclude that King’s statement was not impermissibly coercive. We hold that Pentre Electric is inapposite. In that case we approvingly cited the following summary of the law: “While coercive speech and conduct by an employer are prohibited by the NLRA, the expression of noncoercive views, arguments, and opinions for and against unionization cannot be held unlawful.” Rebecca Hanner White, The Statutory and Constitutional Limits of Using Protected Speech as Evidence of Unlawful Motive Under the National Labor Relations Act, 53 Ohio St. L.J. 1, 3 (1992) (footnote omitted), quoted in NLRB v. Pentre Elec., Inc., 998 F.2d 363, 368 (6th Cir.1993). Although it is true that noncoercive arguments are not unlaw-fill, in' Pentre Electnc we held merely that there was no violation of § 158(a)(1) because “[t]he record is simply devoid of any evidence that [the supervisors] suggested that Pentre might close its doors, much less that they would close Pentre as a means to punish the employees if they voted in favor of the union.” Pentre Elec., 998 F.2d at 370. Thus, contrary to the dissent’s assertions, Pentre Electric is factually very different than the case at hand; King did threaten layoffs, and we believe that the Board’s decision that his statements were coercive is supported by substantial evidence.
We recognize that this case is not easy given the similarities between King’s statements and Kobayashi’s letter. In reaching our conclusion, however, we bear in mind our deferential standard of review and the Supreme Court’s admonition that “a reviewing court must recognize the Board’s competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship.” Gissel Packing, 395 U.S. at 620, 89 S.Ct. 1918. DTR has not challenged the NLRB’s conclusion that DTR did commit some violations; thus, it is clear that the DTR unionization effort led to a tense atmosphere. Given that atmosphere, King’s statements were not carefully phrased to avoid implied threats of reprisal. For these reasons, we uphold the NLRB’s conclusion that King’s statements were coercive and threatening in violation of 29 U.S.C. § 158(a)(1).
C. Gahman’s Credibility
The second issue on appeal is whether the NLRB erred in concluding that DTR threatened to punish Gahman *497 for his union activities and gave Gahman the impression that he was under' surveillance. DTR argues that the NLRB erred because it based its decision solely on Gahman’s testimony — the uncorroborated, biased testimony of a discredited employee. We conclude that the NLRB had substantial evidence in support of its decision. “[T]his Court generally defers to the credibility determinations of the NLRB, particularly where the ‘record is fraught with conflicting testimony and essential credibility determinations have been made.’ ” ITT Auto., 188 F.3d at 384 (quoting Tony Scott Trucking, Inc. v. NLRB, 821 F.2d 312, 315 (6th Cir.1987)).
The ALJ did not rely solely upon Gah-man’s testimony in determining that DTR threatened Gahman with punishment for his union activities and gave Gahman the impression that his activities were under surveillance. The ALJ believed that Gah-man’s testimony was corroborated by King’s own notes from the meeting with Gahman. According to the AL J’s decision, King’s notes show that the meeting “was about Gahman’s union activity ... creating the impression of surveillance.” J.A. at 27 (ALJ Dec. at 27). Furthermore, the ALJ observed that there were other supervisors at the meeting between Gahman and King, yet “[n]one of these other supervisors were called by [DTR] to corroborate King’s testimony.” Id. Thus, there was substantial evidence supporting the ALJ and NLRB’s conclusion.
The fact that Gahman was separately found to have submitted a fraudulent drug sample does not mean that the ALJ and NLRB cannot find him credible as to other issues. The ALJ has the ability to credit parts of a witness’s testimony, even when discrediting other parts of the testimony. Carrier Corp. v. NLRB, 768 F.2d 778, 782 (6th Cir.1985). Given our level of deference for ALJ and NLRB credibility determinations, we conclude that there was substantial evidence supporting the ALJ and NLRB’s conclusion that DTR threatened to punish Gahman for his union activities and gave Gahman the impression that he was under surveillance.
III. CONCLUSION
In the sensitive labor relations setting, employers’ predictions of plant closures and job losses are readily perceived as coercive and threatening by employees, who are dependent on the employer for their livelihood. See Gissel Packing, 395 U.S. at 617,. 89 S.Ct. 1918. Given the strong interest in protecting the rights of employees to associate freely, it is therefore not enough for an employer simply to preface a threat of layoffs with a prediction about customer response to unionization: Any “prediction must be carefully phrased on the basis of objective fact.” Id. at 618, 89 S.Ct. 1918. Without such objective context, it is all too easy for vulnerable employees to perceive their employer as intending to punish union supporters by laying them off if business drops. The law does not require much of an employer, who, as the party in control of the employer-employee relationship, is in the best position to “avoid coercive speech simply by avoiding conscious overstatements he has reason to believe will mislead his employees.” Id. at 620, 89 S.Ct. 1918. Requiring any less would allow employers to consistently circumvent the prohibitions of § 158(a)(1) by simply assuring that their threats are accompanied by vague predictions of the effect of unionization on the firm’s business.
For these reasons, we believe that there was substantial evidence supporting the NLRB’s conclusions that King’s statements violated 29 U.S.C. § 158(a)(1) and that DTR threatened to punish Gahman for his union activities and gave Gahman the impression that he was under surveil *498 lance. Therefore, we DENY the petition for review, and we ENFORCE the NLRB’s order.

. Among the other incidents that provoked the union’s actions, DTR ordered Gahman to remove a hat emblazoned with the UAW logo, claiming the hat was offensive. The NLRB found this to be a violation of 29 U.S.C. § 158(a)(1), and DTR does not contest that finding on appeal.

. The dissent attempts to set up a false dichotomy, asserting that "[w]hen the employer’s prediction concerns a consequence over which he has no control, that by definition cannot constitute a 'threat of reprisal.’ ” Dissenting Op. at 499. This ignores the complex *493 ities and nuances of the type of statements at issue in § 158(a)(1) cases. As contemplated by § 158(c), a statement may contain both predictive and coercive elements. For example, an employer may make a prediction that unionization will cause a customer to decrease its business while also threatening that the employer will choose to deal with that loss of business through layoffs. If the statement that layoffs, rather than alternative measures, will be employed is not "carefully phrased on the basis of objective fact," it may reasonably be viewed by employees as containing a threat of reprisal, losing the protections of § 158(c). Gissel Packing, 395 U.S. at 618, 89 S.Ct. 1918.

. The record before us does not contain the entirety of Kobayashi’s letter. However, when the NLRB considered the effect of the letter, it concluded that the letter was threatening and coercive, DTR Industries, 311 NLRB at 833; thus, presumably the NLRB would have quoted the most damning sections of the letter. To the extent that we rely upon Kobayashi's letter in making our decision, we rely upon the language that the NLRB used in determining that the letter was coercive and threatening.

. The dissent cites the employees’ agreement with statements by DTR’s trial counsel that BCing was discussing customer reaction to a union win. Dissenting Op. at -. While BCing may have made some such objective statements, this does not overcome King's explicit statements that DTR would choose to deal with unionization through layoffs.

. The requirement of objective support does not mean that employers must provide empirical evidence: Although "an employer is not required to ‘produce evidence to corroborate predictions about the effect of unionization,''' our decisions "still requireL] an employer’s statements to have the support of precise objective facts.” ITT Auto., 188 F.3d at 386 n. 8.