**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0332n.06

**Case Nos. 19-2140/2160**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Jun 09, 2020

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CHALLENGE MANUFACTURING COMPANY, LLC, | ) ) ) | |
| Petitioner/Cross-Respondent, | ) ) | ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN |
| v. | ) ) | ORDER OF THE NATIONAL LABOR RELATIONS BOARD |
| NATIONAL LABOR RELATIONS BOARD, | ) ) | |
| Respondent/Cross-Petitioner. | ) ) | O P I N I O N |

BEFORE:     COLE, Chief Judge; McKEAGUE and KETHLEDGE, Circuit Judges.

COLE, Chief Judge.   Challenge Manufacturing Company, LLC ("Challenge" or "the Company") petitions for review of an order of the National Labor Relations Board finding violations of the National Labor Relations Act ("NLRA" or "Act").  The General Counsel for the Board cross-applies for enforcement.  Because the Board did not contravene any of its rules and its findings are supported by substantial evidence, we deny the petition for review and grant the cross-application for enforcement.

**I.**

Challenge is a manufacturer and supplier of automobile parts.  It operates eight manufacturing plants in the United States, including one in Holland, Michigan.  In 2008, Challenge hired Michael Kiliszewski as a maintenance mechanic at the Holland plant.

Historically, employees at Challenge's manufacturing facilities were not unionized. In 2013 and again in 2015, employees at the Holland plant engaged in union campaigns, but the campaigns failed after Challenge actively opposed them. Kiliszewski initiated both campaigns by contacting the United Auto Workers ("UAW" or "Union"). Kiliszewski also played an especially visible role in the 2015 campaign: he wore UAW paraphernalia at work, talked to hundreds of employees about the Union, helped schedule union-organizing meetings, and was one of the first to sign a letter to management expressing a desire to be represented by the UAW.

In 2016, Challenge decided to take a friendlier stance toward unionization, and on May 1, 2016, it signed a "neutrality agreement" with the UAW. Under the terms of the neutrality agreement, Challenge agreed to provide the Union with a list of employees at any plant in the United States upon request, give plant access to Union organizers upon request, and recognize the Union at any plant where a majority of the employees had signed authorization cards. In turn, the Union agreed that while a collective bargaining agreement was being ratified at a previously organized facility, it would not commence campaigns at other Challenge facilities. Even so, individual employees at all times retained the right to engage in union-organizing activities.

In April 2017, while Challenge and the UAW were in the process of ratifying a bargaining agreement at Challenge's facility in Pontiac, Michigan, Kiliszewski began another effort to secure UAW representation at the Holland plant. Kiliszewski's efforts included soliciting signatures on union authorization cards, holding off-site meetings, wearing UAW paraphernalia at work, and discussing the UAW with other employees. At some point, a maintenance supervisor at the Holland plant informed company management—including the vice-president of human resources, Mike Tomko, and human resources manager Darlene

Compeau—that Kiliszewski and Carl Leadingham, another supervisor, were involved in union-organizing activities at the facility. Tomko and Compeau called Leadingham into a meeting on April 25, asked him to identify other employees who were engaging in union-organizing activities, and suspended him for five work days. Shortly after being suspended, Leadingham called Kiliszewski and warned him to "watch his back because supervisors or managers were watching him and others to see their union activity." (J.A. 154.)

About two weeks later, on the evening of May 5, 2017, Kiliszewski arrived at around 10:00 p.m. for his regular work shift, which began at 10:30 p.m. He officially punched in at 10:17 p.m. According to Challenge's policy, however, workers are not allowed on the production floor and are not paid until their shifts have started. Thus, when Norma Sanchez, a production supervisor on the shift prior to Kiliszewski's, approached Kiliszewski several times between 10:00 and 10:30 p.m. and asked him to fix a malfunctioning machine, he communicated to Sanchez that his shift had not yet started and told her to find a mechanic who was being paid at the time.

The last of the exchanges between Kiliszewski and Sanchez became particularly heated. There is conflicting testimony with regard to what exactly happened, but the administrative law judge ("ALJ") determined that Sanchez pointed a finger at Kiliszewski and another mechanic with whom Kiliszewski was conversing, James Eric Mathews, and yelled at them to fix the malfunctioning machine "right now." (J.A. 5.) When the two mechanics repeated that they were not yet on the clock, Sanchez yelled, "You'll do as I say, when I say." (*Id.*) Kiliszewski then admittedly yelled at Sanchez to "go see your f—king 2nd shift maintenance crew" and to get either "the hell" or "the f—k" out of his face. (*Id.*) When Sanchez threatened to go find Kiliszewski's supervisor, Kiliszewski encouraged her to do so. According to Sanchez, as she

was walking away, Kiliszewski said, "F—k you, b—h." (*Id.*) Kiliszewski denies making this last statement. The ALJ declined to credit Sanchez's allegation, finding that "the record does not establish that Kiliszewski used the term 'b—h,' or, in fact, made any statement to Sanchez as she was walking away." (*Id.*)

Three hours after the exchange, around 1:00 a.m. on May 6, Sanchez sent an email to various management personnel at the Holland plant relaying her version of the events. Kiliszewski's direct supervisor, Larry Boyer, who was copied on Sanchez's email, provided Kiliszewski with a copy of the email and told him to avoid Sanchez.

On the morning of May 9, after finishing his shift, Kiliszewski was called into a meeting with Compeau and Jeff Glover, a maintenance manager, to discuss the incident with Sanchez. Compeau asked Keith O'Brien, vice-president of operations and the highest ranking person at the Holland facility, to join the meeting after Kiliszewski refused to look at or speak directly to her. During the meeting, Kiliszewski shared written notes that he had prepared on a copy of Sanchez's email and proceeded to respond largely based on those notes. He admitted to swearing by referring to the "f—king" second-shift maintenance crew, but denied saying "f—k you, b—h," as Sanchez was walking away. Overall, Kiliszewski took the position that, by issuing "demand[s]" of him and Mathews before their shift had even started, Sanchez was the "aggressor" and was "out of line." (J.A. 564–65.) Kiliszewski also expressed the view that Challenge was targeting him because of his union-organizing activity.

Following the May 9 meeting, Compeau proceeded to investigate further by interviewing and gathering statements from other employees who were in the vicinity at the time of the incident. As the ALJ found, "[t]he results of Compeau's investigatory interviews are notable for the extent to which those interviewed indicated that Sanchez was the aggressor in the

confrontation." (J.A. 7.) For example, Liliana Guajardo, who was talking with Sanchez right before Sanchez approached Kiliszewski and Mathews, stated, "I heard Norma [Sanchez] yell at Mike [Kiliszewski] and Eric [Mathews]," and, "I just feel that Norma was aggressive in the way she came up to them." (J.A. 737, 738.) Another employee, Gerald DeCheney, stated that Sanchez "went off" on Kiliszewski. (J.A. 727.) Mathews, who was with Kiliszewski, recalled that Sanchez "kept coming at [Kiliszewski]" and was "not letting him walk away." (J.A. 722.) None of the employees whom Compeau interviewed heard Kiliszewski say "f—k you, b—h," to Sanchez.

Compeau also received a written account from—but did not personally interview—David Napier, a welder who corroborated Sanchez's claim that Kiliszewski said "f—k you, b—h." Based on the record and testimony from other witnesses to the incident, however, the ALJ declined to credit Napier's account. The ALJ moreover concluded that "Compeau did not have a reasonable basis for concluding" that Kiliszewski had made the statement to Sanchez, because "not a single one" of the witnesses whom Compeau interviewed corroborated Sanchez's allegation and Sanchez herself, who was walking away, did not actually see who uttered the statement. (J.A. 8.)

Challenge's employee handbook provides that "extremely serious" misconduct, including "unlawful harassment and discrimination," "will typically lead to termination of employment." (J.A. 655, 669.) But for misconduct that includes "refusing to follow clear instructions of a supervisor" and "[d]irecting abusive or profane language toward a fellow Team Member, supervisor or manager," employees are subject to "progressive discipline." (J.A. 670.) Under this system of progressive discipline, a "verbal written warning" is the appropriate discipline for a first offense, with termination usually imposed only after a fourth offense. (*Id.*) The record

provides many examples of incidents involving insubordination or use of profane language where the Company imposed disciplinary measures well short of discharge.

On May 12, 2017, Challenge immediately terminated Kiliszewski's employment. O'Brien, who gave the final approval for the termination, later testified that the decision was based on Compeau's recommendation that Kiliszewski be discharged and O'Brien's view that Sanchez was believable.

Kiliszewski filed charges with the Board alleging discriminatory discharge and interference with his rights to engage in protected union activity. After a two-day hearing, the ALJ upheld the charges. The ALJ concluded that Leadingham's warning to Kiliszewski to "watch his back" was unlawfully threatening and created the impression that Kiliszewski's protected union activities were under surveillance. The ALJ also concluded that animus toward Kiliszewski's union activities was a motivating factor of his discharge and that Challenge failed to show that Kiliszewski would have been discharged even absent his union activities. Among other remedies, the ALJ ordered Challenge to offer Kiliszewski full and immediate reinstatement and to make him whole for any loss of earnings and benefits.

The Board largely adopted the ALJ's findings and conclusions. It modified the remedy to require Challenge to compensate Kiliszewski for interim expenses regardless of whether such expenses exceeded interim earnings. Challenge now petitions for review of the Board's order, and the General Counsel cross-applies for enforcement.

**II.**

Section 7 of the NLRA guarantees the right of employees "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or

other mutual aid or protection." 29 U.S.C. § 157. To enforce these rights, section 8(a)(1) of the Act makes it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of" their section 7 rights. *Id.* § 158(a)(1). Additionally, section 8(a)(3) prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Id.* § 158(a)(3).

Our review of a Board decision applying the provisions of the NLRA "is quite limited." *Charter Commc'ns, Inc. v. NLRB*, 939 F.3d 798, 809 (6th Cir. 2019) (quoting *Caterpillar Logistics, Inc. v. NLRB*, 835 F.3d 536, 542 (6th Cir. 2016)). We defer to the Board's interpretation of the NLRA as long as it is "reasonable" and "Congress has not spoken to the contrary on the same issue." *Id.* We review the Board's factual findings merely for "substantial evidence," upholding them as long as "they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if we may have reached a different conclusion had the matter been before us de novo." *Id.* (quoting *Airgas USA, LLC v. NLRB*, 916 F.3d 555, 560 (6th Cir. 2019)); *see also* 29 U.S.C. § 160(f); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488 (1951). Finally, "[d]eference to the Board's factual findings is particularly appropriate where the record is fraught with conflicting testimony and essential credibility determinations have been made." *Conley v. NLRB*, 520 F.3d 629, 638 (6th Cir. 2008) (per curiam) (quoting *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir. 1987) (per curiam) (internal quotation marks omitted)). Accordingly, we do not disturb the Board's credibility determinations "unless they have 'no rational basis.'" *Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 967 (6th Cir. 2003) (quoting *NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 242 (6th Cir. 1983) (per curiam)).

**A.**

Challenge appeals only one of the Board's two main findings in this case. It does not contest the Board's finding that, by threatening Kiliszewski with unspecified reprisals for engaging in protected union activity and creating the impression that such activity was under surveillance, it violated section 8(a)(1) of the Act. "By failing to appeal this finding, [Challenge] has admitted its truth." *NLRB v. Galicks, Inc.*, 671 F.3d 602, 608 (6th Cir. 2012). Therefore, we grant enforcement of the portions of the Board's order remedying the uncontested section 8(a)(1) violation. *See id.*; *see also NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 231–32 (6th Cir. 2000).

**B.**

The dispute in this case centers around whether Challenge violated section 8(a)(3) of the Act by discharging Kiliszewski. A section 8(a)(3) claim of discriminatory discharge is evaluated under the burden-shifting framework set forth in *Wright Line*, 251 N.L.R.B. 1083 (1980), and approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983). *Charter Commc'ns*, 939 F.3d at 815; *see also FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 777 (6th Cir. 2002). Under the *Wright Line* framework, the General Counsel initially must "make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." *Wright Line*, 251 N.L.R.B. at 1089. If the General Counsel successfully establishes a prima facie case, then the burden shifts to the employer "to demonstrate that the same action would have taken place even in the absence of the protected conduct." *Id.*

**1.**

Establishing a prima facie case at the first step of the *Wright Line* analysis requires the General Counsel to demonstrate three elements: (1) "the employee was engaged in protected activity"; (2) "the employer knew of the employee's protected activity"; and (3) "the employer acted as it did on the basis of anti-union animus." *Charter Commc'ns*, 939 F.3d at 815 (quoting *Airgas*, 916 F.3d at 561); *accord McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333, 340 (6th Cir. 2017); *FiveCAP*, 294 F.3d at 777. The third element, anti-union motive, may be inferred from purely circumstantial evidence, such as "disparate treatment of certain employees compared to other employees with similar work records or offenses" and "proximity in time between the employees' union activities and their discharge." *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995); *accord Airgas*, 916 F.3d at 561; *FiveCAP*, 294 F.3d at 778. Here, the Board, relying on the findings of the ALJ, concluded that the General Counsel successfully established the elements of a prima facie case. In particular, the Board determined that an anti-union motive could be inferred based on the timing of Kiliszewski's discharge, Challenge's section 8(a)(1) violation, and the evidence of disparate treatment.

Challenge makes several arguments. To start, Challenge argues that the Board held the General Counsel to the wrong standard because it did not explicitly require the General Counsel to establish a causal connection between anti-union animus and Kiliszewski's discharge. The Board, however, has recently clarified that the *Wright Line* framework "is inherently a causation test." *Tschiggfrie Props., Ltd.*, 368 N.L.R.B. 120, at *10 (2019). Identifying a causal nexus as a separate element would accordingly be "superfluous." *Id.* The Board further clarified that "the General Counsel does not *invariably* sustain his burden" at the first step of the *Wright Line* analysis "by producing . . . *any* evidence of the employer's animus or hostility toward union or

other protected activity." *Id.* at \*11. "Instead, the evidence must be sufficient to establish that a causal relationship exists between the employee's protected activity and the employer's adverse action against the employee." *Id.* In any event, the ALJ here did examine whether a causal nexus existed. Specifically, the ALJ found that the timing of Kiliszewski's discharge and the evidence of disparate treatment supported "an inference of anti-union animus connected to the discharge." (J.A. 12.) Overall, the ALJ concluded that the circumstantial evidence in the record established Kiliszewski's involvement as "a leader of unionization efforts at the facility, [Challenge's] animosity towards that activity and a connection to the discharge decision." (*Id.*)

Challenge also argues that the Board erred in failing to require the General Counsel to prove directly that O'Brien, the ultimate decision-maker, acted with anti-union animus. This argument misses the mark because there is no such rule. Rather, it is well-established that anti-union motive may be inferred from circumstantial evidence. *Charter Commc'ns*, 939 F.3d at 815; *FiveCAP*, 294 F.3d at 778; *W.F. Bolin Co.*, 70 F.3d at 871; *see also Overnite Transp. Co.*, 335 N.L.R.B. 372, 375 (2001) ("The Board has long recognized that direct evidence of an unlawful motive, i.e., the proverbial smoking gun, is seldom obtainable. Hence, an unlawful motive may be inferred from all of the surrounding circumstances."). The cases to which Challenge draws our attention do not say otherwise. Rather, those cases are ones in which the Board, on de novo review, concluded that the circumstantial evidence was not strong enough to support an inference of an anti-union motive. *See Pro-Tec Fire Servs. Ltd.*, 351 N.L.R.B. 52, 53–54 (2007); *Alexian Bros. Med. Ctr.*, 307 N.L.R.B. 389, 389–90 (1992).

Next, Challenge argues that the Board overlooked the neutrality agreement, and therefore, its finding of an anti-union motive cannot be supported by substantial evidence. But the Board did consider the neutrality agreement in its analysis of whether the General Counsel

made a sufficient showing of an anti-union motive. In finding that the General Counsel met his initial burden, the Board relied partly on the Challenge's section 8(a)(1) violation. This violation, as the ALJ found, followed from management's "apparent misunderstanding" that the neutrality agreement "guaranteed it a respite" from the sorts of union-organizing activities that Kiliszewski was undertaking. (J.A. 12.) Thus, the Board did consider the neutrality agreement, finding that Challenge's misunderstanding of the agreement partly supported an inference that Kiliszewski was discharged in whole or in part because of his union-organizing activities.

That leaves the last of Challenge's arguments: substantial evidence does not support the Board's finding of an anti-union motive because the evidence on which the Board relied does not reasonably give rise to an inference of an unlawful motive. The Board relied specifically on three factors: the timing of Kiliszewski's discharge, the Company's section 8(a)(1) violation, and the disparate treatment that Kiliszewski received compared to other employees who had acted insubordinately or used profanity. The ALJ's decision elaborates:

> Kiliszewski had not received prior discipline of any kind during his more than 8 years with the Respondent. Then just 2 or 3 weeks after the Respondent first received a report that Kiliszewski was behind a 2017 organizing effort, the Respondent not only disciplined him, but imposed the ultimate discipline of discharge. The evidence raises an inference of anti-union animus connected to the discharge and easily clears the General Counsel's third hurdle under *Wright Line*.

(J.A. 12.) These findings are supported by the record, and we cannot say that they forbid an inference that Kiliszewski was discharged at least in part because of his union-organizing efforts. *Cf. W.F. Bolin Co.*, 70 F.3d at 871–73 (concluding that even though the record did not show outright hostility toward unionization on the employer's part, an inference of an anti-union motive was permissible based on the circumstantial evidence, including that of timing and disparate treatment). Because the record here reasonably permits an inference of an anti-union

motive, substantial evidence supports the Board's finding that the General Counsel established a prima facie case.

**2.**

Under the *Wright Line* framework, once the General Counsel establishes a prima facie case, the employer may mount an affirmative defense by showing that it would have taken the same action even without any anti-union animus. *Wright Line*, 251 N.L.R.B. at 1089; *see also Transp. Mgmt.*, 462 U.S. at 401–02. Here, Challenge contends that the decision to fire Kiliszewski was made independent of any anti-union animus. According to Challenge, it discharged Kiliszewski because he admittedly refused to follow a supervisor's orders and used profanity, and the Company had a good-faith belief that he uttered a gender-based slur. The Board, however, found that Challenge failed to carry its burden because the Company had no reasonable basis for concluding that Kiliszewski uttered a gender-based slur, and its choice of discipline was disproportionately harsh given its policies and prior practices in similar circumstances.

Because the Board reached the conclusion that Challenge *failed* to meet its burden, our review here "is of a slightly different stripe than on the prima-facie-case prong." *W.F. Bolin Co.*, 70 F.3d at 873–74. Rather than asking whether substantial evidence supports the Board's finding, we ask whether the finding "is reasonable in view of the evidence as a whole." *Id.* at 874. This means that Challenge must do more than "simply show[] that the evidence supports an alternative story"; it "must show that the Board's story is unreasonable." *See Charter Commc'ns*, 939 F.3d at 816 (quoting *Galicks*, 671 F.3d at 608).

Challenge argues that the Board's analysis is fundamentally flawed because it focuses on whether Kiliszewski actually uttered a gender-based slur to Sanchez rather than on whether the

Company had a good-faith belief that he did. In other words, according to Challenge, the Board inappropriately required the Company to show that it was wholly motivated by the *fact* (rather than simply a *good-faith belief*) that Kiliszewski uttered a gender-based slur. But the Board did not hold Challenge to such a standard. Instead of simply determining that Kiliszewski never uttered the alleged gender-based slur, the Board determined that "Compeau did not have a reasonable basis for concluding Kiliszewski had done so." (J.A. 8.) The ALJ's decision explains:

> Sanchez made this claim, but even in her account she did not see who had made the alleged statement. On the other hand, Compeau interviewed five witnesses to the incident . . . and not a single one of them corroborated Sanchez' claim that Kiliszewski had said "f—k you b—h" to her.

(*Id.*) The record substantiates the ALJ's explanation.

Meanwhile, O'Brien interviewed no witnesses. He relied on Compeau's investigation and recommendation in giving his final approval for Kiliszewski's discharge, and he was not even in the room when Compeau informed Kiliszewski of his discharge. Thus, Challenge's argument that the Board could only consider O'Brien's belief specifically is unconvincing. We conclude that the Board did not contravene any rules in its consideration of the second step of the *Wright Line* test.

The cases that Challenge points out do not compel a different conclusion. In *Sutter East Bay Hospitals v. NLRB*, 687 F.3d 424, 435–37 (D.C. Cir. 2012), the D.C. Circuit held that the Board did not properly apply the second step of the *Wright Line* analysis because the Board entirely failed to examine the employer's beliefs and whether they were reasonable. Such is not the case here. Challenge also points to the Board's decision in *DTR Industries, Inc.*, 350 N.L.R.B. 1132 (2007), *enforced*, 297 F. App'x 487 (6th Cir. 2008). In that case, the Board

reversed the ALJ's decision and dismissed a discriminatory-discharge claim upon de novo review. *Id.* The Board found that the employer had met its burden of showing that it held, and acted wholly upon, a reasonable belief that the employee had committed the alleged misconduct. *Id.* at 1135–36. Here, in contrast, the Board agreed with the ALJ that Challenge's belief was not reasonable and that Kiliszewski's discharge, given the circumstances and Challenge's policies, was "highly suspicious." (J.A. 13.)

The Board's findings have reasonable support in the record. The incident that the Company used to justify Kiliszewski's discharge occurred at a time when he was not being paid and not even supposed to be on the production floor. None of the witnesses whom Compeau personally interviewed heard Kiliszewski utter "f—k you, b—h." Many of those same witnesses indicated that Sanchez, not Kiliszewski, was the "aggressor." Finally, Challenge meted out discipline far less serious than discharge in other instances of insubordination and disrespectful language. For example, in March 2017, one employee merely received a written warning for both "undermining supervisory authority" and "abusive language towards fellow team members." (J.A. 603.) Another employee continued to be employed by the Company despite at least ten separate instances of misconduct—including swearing and yelling at team members, disrespecting supervisors, and refusing to follow instructions. All in all, it was reasonable for the Board to have found that Challenge did not carry its burden of rebutting an inference of anti-union motive. *See Charter Commc'ns,* 939 F.3d at 816; *W.F. Bolin Co.*, 70 F.3d at 874.

Accordingly, substantial evidence supports the Board's finding of a section 8(a)(3) violation.

## C.

Last, we turn to the Board's ordered remedy. In accordance with its decision in *King Soopers, Inc.*, 364 N.L.R.B. 93, at \*11 (2016), *enforced in relevant part*, 859 F.3d 23, 39 (D.C. Cir. 2017), the Board ordered Challenge to compensate Kiliszewski for any search-for-work and interim expenses, without any offset against his interim earnings. Challenge contends that the Board exceeded its authority in ordering such a remedy. But we have already held that this is a permissible remedy. *Lou's Transp., Inc. v. NLRB*, 945 F.3d 1012, 1024–25 (6th Cir. 2019); *Erickson Trucking Serv., Inc. v. NLRB*, 929 F.3d 393, 398 (6th Cir. 2019). The Board did not exceed its authority here.

## III.

We deny Challenge's petition for review and grant the General Counsel's cross-application for enforcement of the Board's order.