# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 17, 2018       Decided March 5, 2019

No. 17-1221

NOVATO HEALTHCARE CENTER,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 17-1232

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Ryan N. Parsons* argued the cause for petitioner. With him on the briefs was *Kamran Mirrafati*.

*Rebecca J. Johnston*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Peter B. Robb*, General Counsel, *John W. Kyle*, Deputy General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Supervisory Attorney.

Before: GARLAND, *Chief Judge*, GRIFFITH, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: In 1992, Vincent Gambini taught a master class in cross-examination.[1] Trial counsel for the National Labor Relations Board and the National Union of Healthcare Workers apparently paid attention. In this petition for review, Novato Healthcare Center challenges the Board's finding that it committed an unfair labor practice by firing four union organizers two days before a union election. As Novato acknowledges, its "entire case turns on whether the testimony" of one of its supervisors "should be credited." Reply Br. 5. But the Board determined that the testimony should not be credited, and trial counsel's cross-examination of the supervisor provides substantial evidence to support that determination. For this reason, and because the other findings that Novato challenges are also supported by substantial evidence, we deny Novato's petition for review and grant the Board's cross-application for enforcement.

I

Novato operates a skilled-nursing facility in California that cares for about 170 patients. On September 16, 2015, the National Union of Healthcare Workers filed a petition with the National Labor Relations Board (NLRB) to represent a unit of Novato employees. Among the employees leading the union-organizing effort were Narvius Metellus, Rolando Bernales, Arlene Waters Brown, and Angel Sabelino. All four attended union meetings, collected show-of-interest signatures, wore pro-union buttons and lanyards, distributed union regalia, and passed out flyers promoting the union.

---

[1] *See* MY COUSIN VINNY (Twentieth Century Fox 1992) (cross-examination of Mr. Tipton); *infra* note 5.

Novato's management undertook its own union-opposition campaign. Although Novato supervisors did not generally work night shifts, facility administrator Darron Treude asked supervisors to volunteer for those shifts so they could provide union-opposition materials to employees and answer their questions. CPEhr, an outside consulting group that provides employment law advice, spearheaded the union-opposition campaign on behalf of Novato.

On October 4, 2015, ten days before the October 14-15 representation election, Novato supervisor Gay Rocha approached employee Metellus at approximately 6:30 a.m. Rocha asked Metellus, who was a relatively new employee, how he planned to vote in the upcoming election. When Metellus responded that he planned to vote in favor of the union, Rocha told him that doing so would have implications for his pay and that the union could potentially take a portion of his paycheck. Metellus responded that this would not be a problem for him.

On October 6-7, Metellus, Bernales, Brown, and Sabelino worked the night shift together at Station 4, one of four nursing stations at the Novato facility. During that shift, another employee, Gonzala Rodriguez, whose union views were and remain unknown, worked at Station 1. At Novato, night-shift employees work from 11:00 p.m. to 7:00 or 7:30 a.m., depending on their positions. During a shift, employees are allowed two 10-minute rest breaks. In addition, they are allowed one 30-minute meal break. Employees routinely sleep during these breaks, which they are permitted to take at any time, so long as at least one station member is available. *See Novato Healthcare Ctr.*, 365 N.L.R.B. No. 137, at 7 (Sept. 29, 2017) (ALJ Op.).

Novato supervisor Teresa Gilman also worked the night shift on October 6-7, as part of Novato's union-opposition

campaign. According to Gilman's testimony at the subsequent unfair labor practices hearing, she arrived at the Novato facility some time after 3:50 a.m. on October 7. After completing a number of tasks, Gilman began making the rounds of the nursing stations, starting with Station 4.

Gilman testified that, when she arrived at Station 4, she saw all four employees sleeping. She said she stood in front of the employees for "several seconds to up to a minute" to see if they would wake up. *Id.* at 11. According to Gilman, they did not.

Gilman then proceeded to Stations 3 and 1.[2] She testified that, at Station 1, she saw another employee, Rodriguez, sleeping. According to Gilman, Rodriguez was sitting in a chair outside a patient's room with her head down on a table.

On Gilman's second and third rounds through Stations 4, 3, and 1, she said she saw all five employees still asleep in the same positions in which she had last seen them. On her third visit to Station 4, Gilman used her cell phone to take a photograph of two of the four employees, Brown and Sabelino. The photo shows the two with their eyes closed. Although the photograph initially did not have a timestamp, Gilman later produced a version with a timestamp of 4:21 a.m.

Timing, in this case, is (almost) everything. Gilman testified that at least 15 to 20 minutes passed from the time she first arrived at Station 4 and saw the employees sleeping, to the time she took the photograph of the two sleeping employees. If true, this meant that at least two of the Station 4 employees had been sleeping considerably longer than their permitted 10-minute breaks.

---

[2] She did not stop at Station 2 because it was "an alarmed unit and alarms would go off." J.A. 443 (Gilman Test.).

Gilman then went on to revisit Station 1. She noticed that Rodriguez was still sleeping and informed the charge nurse, who woke her up. Gilman estimated that Rodriguez had been asleep for at least 15 to 20 minutes as well. By the time Gilman returned to Station 4 for a fourth time, all four employees there were awake.

On the morning of October 7, Gilman sent administrator Treude the photograph and soon thereafter informed him that the five employees had been asleep for 15 to 20 minutes. Treude suspended all five and initiated an investigation. Novato's outside counsel, Richard Albert, as well as its outside consulting group, CPEhr, provided input regarding disciplinary options. Specifically, in an email to Treude and CPEhr, Albert recommended that Treude terminate all five employees. Although Albert recognized that Rodriguez was "a bit of a different story" because her "Charge Nurse appears to have tolerated her sleeping," he still recommended her termination: "[G]iving her lesser discipline, in this situation, sends the wrong message to the NLRB or a judge looking at this. It is possible that [the] NLRB or judge could view her situation as being less serious than the others, but I would rather have you take that risk, than the risk that letting her remain employed somehow dilutes our arguments with the other 4." Email from Albert to Treude, et al. (Oct. 10, 2015) (J.A. 529).

On October 12, two days before the scheduled election, Treude fired all five employees for sleeping on duty. On October 14 and 15, the NLRB conducted the election, which the union won.

Thereafter, the union charged Novato with committing unfair labor practices, and the NLRB's General Counsel issued a complaint. Gilman testified as recounted above. The two Station 4 employees captured in the photograph, Brown and

Sabelino, acknowledged that they had slept, but said they did so only during their permitted 10-minute breaks. Bernales testified that, although he had rested during his allowed meal break, he did not sleep after returning to Station 4 at 4:00 a.m. Metellus testified that he did not sleep at all during that shift. Rodriguez, the Station 1 employee, did not testify.

Following a multi-day hearing, the ALJ found that Novato violated the National Labor Relations Act (NLRA) by suspending and firing the five employees, and also violated the Act when Rocha questioned Metellus about how he planned to vote. 365 N.L.R.B. No. 137, at 18. The Board affirmed the ALJ's rulings, findings, credibility determinations, and conclusions, with minor modifications. *Id.* at 1.

Novato has now filed a petition for review in this court, and the NLRB has filed a cross-application for enforcement of its order. Under the applicable standard of review, we must uphold the judgment of the Board unless its findings are unsupported by substantial evidence, or it acted arbitrarily or otherwise erred in applying established law to the facts of the case. *Spurlino Materials, LLC v. NLRB*, 805 F.3d 1131, 1136 (D.C. Cir. 2015); *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011); *see* 29 U.S.C. § 160(f) (providing that the Board's findings of fact are "conclusive" if "supported by substantial evidence on the record considered as a whole").

II

We begin with Novato's challenge to the Board's finding that Novato violated Section 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1), (3), by suspending and then firing the four employees at Station 4. It is on this issue that the information elicited by cross-examination is important.

An employer violates Section 8(a)(1) and (3) by suspending or discharging an employee for engaging in protected union activity. *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 397-98 (1983); *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983); *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 125 (D.C. Cir. 2001).[3] The Board employs the judicially approved *Wright Line* test when reviewing a claim that an employer discharged (or took other disciplinary action against) an employee for protected conduct. *See Wright Line*, 251 N.L.R.B. 1083, 1089 (1980); *see also Transp. Mgmt. Corp.*, 462 U.S. at 401-03 (approving the *Wright Line* test); *Bally's Park Place*, 646 F.3d at 935. "Under that test, the General Counsel must first 'make a prima facie showing sufficient to support the inference that protected . . . conduct was a motivating factor in the [discharge].'" *Tasty Baking*, 254 F.3d at 125 (quoting *TIC-The Indus. Co. Se. v. NLRB*, 126 F.3d 334, 337 (D.C. Cir. 1997)). "Once a prima facie case has been established, the burden [of persuasion] shifts to the company to show that it would have taken the same action in the absence of the unlawful motive." *Id.* at 126; *see Bally's Park Place*, 646 F.3d at 935.

In the proceedings below, Novato disputed the unfair labor practice charges at both steps of the *Wright Line* test. With respect to the first step, the ALJ, affirmed by the Board, readily

---

[3] Section 7 of the NLRA guarantees employees the "right to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) provides that "[i]t shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in Section 7. *Id.* § 158(a)(1). And Section 8(a)(3) prohibits "discrimination in regard to . . . tenure of employment . . . to . . . discourage membership in any labor organization." *Id.* § 158(a)(3).

found sufficient evidence to support the inference that anti-union animus was a motivating factor in the suspension and discharge of the Station 4 employees. The "record show[ed]," the ALJ recounted, that the four employees "visibly supported the union organizing campaign by [inter alia] wearing lanyards and buttons, passing out flyers, and getting employees to sign [up] for a showing of interest," and that "their actions were visible from Treude's office." 365 N.L.R.B. No. 137, at 16. In light of those facts, the ALJ rejected, as "disingenuous," Novato's "claims that its supervisors were unaware of the employees' union activity." *Id.* She specifically declined to "credit Gilman's testimony that she did not know whether the allegedly sleeping employees were union supporters since she did not notice any union lanyards or pins," because Gilman "also testified in incredible detail as to how the employees were positioned and claimed to have stood in front of them for some time." *Id.* In addition, the ALJ noted that the "suspensions and discharges occurred only a couple weeks after the filing of the representation petition and only 1 week prior to the representation election." *Id.* And she also noted that Novato's animus was "demonstrated by its contemporaneous 8(a)(1) violation[]": Rocha's unlawful interrogation of Metellus about his preference in the representation election. *Id.*

The ALJ found additional support for the inference of animus and discriminatory motivation in the fact that Novato "acted disparately": "No other employees had been suspended and discharged for the same or similar allegations." *Id.* at 17. She observed that, "[i]n a similar situation in 2009 where an employee allegedly slept on duty, [Novato] did not discipline this employee even though there too was a picture of the sleeping employee." *Id.* The ALJ further noted that, although just one week "prior to the events at issue in [t]his matter, one of [Novato's] supervisors also reported employees sleeping during the night shift[,] . . . Treude failed to investigate or follow

up on this allegation." *Id.* Instead, "Treude singularly focused on Metellus, Bernales, Brown, and Sabelino and one can only conclude it was due to their union activity." *Id.*

In this court, Novato does "not contest the Board's finding of an unlawful motivation in discharging the employees at issue." Reply Br. 2; Oral Arg. at 1:50-2:33. Rather, Novato's sole contention is that it met its burden of proof under the second step of the *Wright Line* test by proving "that it would have taken the same action absent the improper motive." Reply Br. 4. As it argued below, Novato maintains here that it would have terminated the four regardless of their union support because of the "brazen" nature of their conduct in sleeping on duty. 365 N.L.R.B. No. 137, at 17 (ALJ Op.).

The ALJ, affirmed by the Board, rejected Novato's *Wright Line* defense. *Id.*; *see id.* at 1 nn. 1, 2 (Board Op.). She rejected Treude's testimony in its entirety for multiple reasons, including his demeanor, *id.* at 5 (ALJ Op.) ("evasive[], . . . vague and contradictory"), and his disparate treatment of earlier sleeping-on-the-job claims, *id.* at 17. As discussed below, she specifically discredited Gilman's testimony that she saw the four employees sleeping on duty. *Id.* at 5. Instead, she credited in its entirety the testimony of Brown, and in relevant part the testimony of Sabelino, both of whom acknowledged that they had slept but said they did so only during their permitted 10-minute breaks. *Id.*[4] In addition, the ALJ credited the testimony of Bernales, who testified that the only rest he took was during his permitted 30-minute meal break prior to 4:00 a.m., and of Metellus, who testified that he did not sleep at all during the shift. *Id.* at 5-6.

---

[4] The ALJ further credited Brown's testimony that she ensured that Metellus and Bernales were both awake and working when she went to sleep on her break. 365 N.L.R.B. No. 137, at 5.

Novato acknowledges that its Step 2 *Wright Line* argument -- that it would have discharged the four employees regardless of any anti-union motive because they were sleeping on duty well past their permitted rest periods -- turns entirely on "whether the testimony of Gilman should be credited." Reply Br. 5; Oral Arg. at 2:40-3:00. Novato's success therefore depends on persuading us that the ALJ's conclusions about Gilman's credibility were unsupported. And that presents Novato with a difficult task because "we do not reverse the Board's adoption of an ALJ's credibility determinations unless . . . those determinations are 'hopelessly incredible,' 'self-contradictory,' or 'patently unsupportable.'" *Shamrock Foods Co. v. NLRB*, 346 F.3d 1130, 1134 (D.C. Cir. 2003) (quoting *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 28 (D.C. Cir. 1998)).

Novato insists that it is up to this difficult task because photographic evidence "fully corroborated" Gilman's testimony "that the Unit 4 employees were sleeping for 20 minutes." Reply Br. 6, 5. That itself is an overstatement of Gilman's actual testimony, which was that the employees were sleeping "at least 15 to 20 minutes." J.A. 456 (Gilman Test.). Be that as it may, Novato's argument here is in line with the position it took before the ALJ:

> Immediately after the October 7 incident, Gilman reported that she began her rounding at approximately 4:00 am on October 7, and took the photo of Brown and Sabelino somewhere around 15-20 minutes later. At the time she made these representations, the photo Gilman had taken had no time stamp on it. . . . Once she [downloaded a software update on her smart phone], a time stamp appeared indicating that the picture was taken at 4:21 am . . . . *This indisputable time stamp evidence is totally consistent with Gilman's*

> *testimony as well as her prior statements about the events of October 7 -- she arrived on Unit 4 at or slightly after 4:00 am, and took the photo at least 15-20 minutes later.*

Novato Post-Hearing Br. 15 (emphasis added). Like the ALJ, we will assume that the 4:21 a.m. timestamp was accurate, notwithstanding some doubts in that regard. *See* 365 N.L.R.B. No. 137, at 5, 12 n.27.

And here is where the lesson Vinny Gambini taught comes into play. A key issue in the murder trial of Vinny's cousin, Bill, was how many minutes had passed between the time witness Sam Tipton saw Bill enter the Sac-O-Suds convenience store and the time he heard a gunshot. On direct examination, Tipton testified that he was sure only five minutes had passed because he saw Bill go into the store as he (Tipton) started making breakfast, and the shot rang out just as his breakfast was ready to eat. On cross-examination, Vinny elicited Tipton's breakfast-making process. By the end of the cross, it was clear that Tipton could not have cooked his breakfast of eggs and grits in just five minutes.[5]

---

[5] The cross-examination proceeded as follows:

Q. Well, how much time was they in the store?
A. Five minutes.
Q. Five minutes? Are you sure, did you look at your watch?
A. No.
Q. Oh, oh, I'm sorry, you testified earlier that the boys went into the store, and you had just begun to make breakfast, you were just ready to eat, and you heard a gunshot. . . . So obviously it takes you five minutes to make breakfast.
A. That's right. . . .
Q. Do you remember what you had?
A. Eggs and grits.

12

So, too, here. Gilman testified that the only time she saw a clock on the morning of October 7 was when she stopped at a stop sign, three blocks from work, and noticed that her car's clock showed it was 3:50 a.m. On cross-examination, she initially claimed that it took her only 5 to 10 minutes to get from that stop sign to Station 4, where she said she first encountered the four sleeping employees. J.A. 490 (Gilman Test.). If Gilman really had reached Station 4 in just 5 to 10 minutes, that would indeed have put her in a position to observe the sleeping employees at Station 4 at (or before) 4:00 a.m. -- just as Novato's brief claimed. And if we further assume the accuracy of the 4:21 a.m. timestamp on the photograph Gilman took the last time she saw them sleeping, that would establish that at least

---

Q. Eggs and grits. I like grits too. How do you cook your grits? You like 'em regular, creamy, or al dente?
A. Just regular, I guess.
Q. Regular. Instant grits?
A. No self-respecting Southerner uses instant grits. I take pride in my grits.
Q. So, Mr. Tipton, how could it take you five minutes to cook your grits, when it takes the entire grit-eating world twenty minutes?
A. I don't know. I'm a fast cook I guess.
Q. I'm sorry . . . . Are we to believe that boiling water soaks into a grit faster in your kitchen than on any place on the face of the earth?
A. I don't know.
Q. Well, perhaps the laws of physics cease to exist on your stove? Were these magic grits? . . .
Q. Are you sure about that five minutes? . . .
A. I may have been mistaken.

American Rhetoric: Movie Speech, "*My Cousin Vinny* (1992)," https://www.americanrhetoric.com/MovieSpeeches/moviespeechmy cousinvinny3.html (video clip).

the two employees in the photo had been sleeping for at least 20 minutes -- again, just as Novato claimed.

The problem with this timeline is the sheer number of tasks Gilman claimed to have completed between stopping at the stop sign at 3:50 a.m. and arriving at Station 4 just 5 to 10 minutes later. During NLRB counsel's cross-examination of Gilman, counsel drew out the following list of activities Gilman said she had completed during that period:

> - driven three more blocks to the Novato facility, stopping at another stop sign along the way;
>
> - parked her car and went into the facility;
>
> - walked to her office, where she logged on to her computer and checked her emails;
>
> - walked to the facility's kitchen, where she checked the temperature logs for a refrigerator, for a walk-in refrigerator, and for a walk-in freezer; and checked the labels and dates of the items in the refrigerators;[6]
>
> - walked to and through the break room, where she used the restroom and then collected Novato union-opposition campaign flyers, on which someone had written "derogatory stuff";
>
> - gone back to her office and read the flyers;
>
> - walked down the hallway toward Station 4, peeking in rooms along the way; and

---

[6] During her direct examination, Gilman testified that she had also opened the oven doors, inspected the stove, and tidied up. *See* J.A. 427 (Gilman Test.).

> \- arrived at Station 4 for the first time, where she saw the sleeping employees.

*See* Gilman Test. Tr. 804-15 (cross-examination by Marta Novoa, NLRB attorney).

When the union's attorney took up the tag-team match during her own shot at cross-examination, she hammered the point home:

> Q. So it's your testimony that it only took [10] minutes to drive from the 7-Eleven [near the first stop sign], park, to go into your office, to log onto your computer, to check your email, go to the bathroom, use the restroom, cleanup the break room a little bit of these flyers, and go through all the procedures that [you] went through . . . in your kitchen.
>
> A. . . . [S]o roughly I would still say about five -- it wasn't that long, you know.  It wasn't that long. . . .
>
> Q. So I'm trying to figure out from that time, driving, going through another stop sign, parking, getting in, unlocking your door, putting everything down, everything you did between there and when you first saw people sleeping, are you sure it was only ten minutes or less?  Or could it have been 15 or 20 minutes?
>
> A. No, it could not have been 15 or 20 minutes . . . .
>
> Q. Isn't it true you're just not sure how long it took you to get from the stop sign to [] Station 4 . . . ?
>
> A. Well, to me it seemed like everything that I was doing, it seemed like about 10 minutes had passed.
>
> Q. But you never looked at a clock to make sure that's correct?

A. Correct.

J.A. 490-92 (cross-examination by Heather Conger, union attorney).

In light of the sheer "number of functions" Gilman "claimed to perform[,] . . . all within a very short time period," the ALJ regarded her testimony as "simply . . . implausible." 365 N.L.R.B. No. 137, at 5. Moreover, Gilman's testimony about how long the tasks had taken in the aggregate was rendered even more implausible by counsel's further cross-examination about how long some of them had taken individually. In response to counsel's questions, Gilman testified that: "from the stop sign to [the facility] that's three or four minutes"; "[i]t takes three to four minutes to log onto my computer"; "[w]hat I did in my kitchen took a few minutes"; "I went over to the break room, [which] took three or four minutes"; and then "I left and went back to my office [put down the flyers, and looked at them again] just briefly." J.A. 490-91 (Gilman Test.); Gilman Test. Tr. 814-15. By Gilman's own account, then, those activities *alone* took about 15 minutes. Given the additional, unaccounted-for activities that Gilman also had to complete, the ALJ reasonably concluded that Gilman's aggregate time estimate was "unlikely and unbelievable due to the length of time she allocated to each task she completed" before first encountering the sleeping employees. 365 N.L.R.B. No. 137, at 11 n.25.

Nor was Gilman's implausible timeline testimony the only problem the ALJ had with her credibility. So, too, was Gilman's failure to photograph the other two employees who, she claimed, were also asleep at the same time at the same nursing station. So, too, was her failure to attempt to wake any of the four employees, or to seek immediate assistance from other supervisors, despite Novato's contention that the employees had to be fired because they had put patients dangerously at risk by

sleeping on the job. *See id.* at 5. So, too, was her assertion that she did not know the four were union adherents because she did not notice that they all wore pro-union lanyards and buttons -- despite her claim that she could "recall significant details on how the employees slept" because she got within "arm's reach" of them. *Id.* at 5, 11. And so, too, was Gilman's denial that she herself wore an anti-union lanyard that morning, a denial she later had to withdraw. *Id.* at 5, 8 (admitting that she, along with other supervisors, wore lanyards urging employees, in capital letters, to "KEEP YOUR VOICE VOTE NO").

In the end, the ALJ simply could "not find [Gilman's] testimony credible and reject[ed] her version of events completely." *Id.* at 5. The Board saw "no basis for reversing" that finding, *see id.* at 1 n.1, and neither do we. Novato proffers no other evidence that Brown and Sabelino were sleeping longer than their permitted break times and no other evidence that Metellus and Bernales were sleeping at all. Given the absence of such evidence, combined with the contrary testimony that the ALJ reasonably credited, we find nothing unreasonable in the Board's conclusion that Novato failed to meet its burden of showing it would have fired the four employees notwithstanding its anti-union animus.

III

Novato also disputes the Board's determination that it fired Rodriguez, the Station 1 employee, in violation of Section 8(a)(1) and (3) of the NLRA. Novato emphasizes the "total lack of evidence" that Rodriguez did not sleep or that she was a union supporter. Novato Br. 21. This argument fails because the Board did not rely on such evidence to conclude that Novato committed an unfair labor practice by firing Rodriguez. Rather, the ALJ found, and the Board affirmed, that Novato violated the Act by using Rodriguez as a "pawn in an unlawful design." 365

N.L.R.B. No. 137, at 18 (quoting *Corliss Res., Inc.*, 362 N.L.R.B. No. 21, at 4 (2015)).

Although Rodriguez's union views were unknown, the ALJ concluded that Novato fired her along with the Station 4 employees "for fear of diluting its argument against the other discriminatees" and to "'cover' its unlawful suspension and termination of the other 4 employees." *Id.* As the Board has long held, "an employer's discharge of uncommitted, neutral, or inactive employees in order to 'cover' or to facilitate discriminatory conduct against a targeted union-supporting employee or to discourage employee support for the union is violative of Section 8(a)(3) of the Act." *Dawson Carbide Indus., Inc.*, 273 N.L.R.B. 382, 389 (1984); *see Metro-West Ambulance Servs., Inc.*, 360 N.L.R.B. 1029, 1056 (2014); *Bay Corrugated Container, Inc.*, 310 N.L.R.B. 450, 451 (1993); *see also Alpo Petfoods, Inc. v. NLRB*, 126 F.3d 246, 255-56 (4th Cir. 1997).

Here, substantial evidence supports the Board's conclusion that Rodriguez was discharged alongside the Station 4 employees in order to provide cover for Novato's discriminatory conduct toward those union supporters. The email from Novato's outside counsel to administrator Treude all but admitted as much. Counsel acknowledged that Rodriguez was "a bit of a different story" from the other four because her "Charge Nurse appears to have tolerated her sleeping." Email from Albert to Treude, et al. (Oct. 10, 2015) (J.A. 529). Nonetheless, he suggested that Treude fire her to avoid "dilut[ing] [Novato's] arguments with the other 4." *Id.* And as the ALJ noted, "[d]espite claiming that he did not read [the] email recommendations, Treude exactly followed [the] advice." 365 N.L.R.B. No. 137, at 18; *see id.* at 13 n.39.

18

IV

Finally, Novato challenges the Board's finding that supervisor Gay Rocha unlawfully interrogated employee Narvius Metellus in violation of Section 8(a)(1) of the NLRA.

On Sunday, October 4, 2015, ten days before the election, Rocha "came into the facility early as part of [Novato's] opposition campaign." 365 N.L.R.B. No. 137, at 9 (ALJ Op.). Metellus testified that Rocha came up to him while he was standing near a vending machine and asked "how he planned to vote in the upcoming union election." *Id.* When Metellus said he planned to vote in favor of the union, Rocha told him that doing so would have implications for his pay and that the union could possibly take part of his paycheck. *Id.*[7]

"The questioning of an employee about union activities or sympathies constitutes unlawful interrogation 'if, under all the circumstances, it reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act.'" *Shamrock Foods*, 346 F.3d at 1137 (quoting *Perdue Farms, Inc. v. NLRB*, 144 F.3d 830, 835 (D.C. Cir. 1998)). In examining the totality of the circumstances, the Board considers such factors as: the nature of the information sought; the seniority of the questioner in the employer's hierarchy; the place and manner of the conversation, including whether it took place during a disputed union campaign and whether the employee was alone; the truthfulness of the employee's reply; and whether the questioner offered any legitimate purpose for his question or assurance against reprisal.

---

[7] In Rocha's testimony before the ALJ, she denied speaking to Metellus about his position regarding the union. The ALJ found that "Rocha cannot be believed" and credited Metellus's version of events. 365 N.L.R.B. No. 137, at 9. Before this court, Novato does not dispute Metellus's recounting of his interaction with Rocha.

*See, e.g.*, *Shamrock Foods*, 346 F.3d at 1137; *Perdue Farms*, 144 F.3d at 835-36; *Rossmore House*, 269 N.L.R.B. 1176, 1178 n.20 (1984) (citing *Bourne v. NLRB*, 332 F.2d 47 (2d Cir. 1964)). The test is an objective one; proof of actual coercion is not required. *See United Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 913 (D.C. Cir. 2004).

In this case, the ALJ found that Rocha's questioning about Metellus's union views "would have a reasonable tendency to interfere with an employee's Section 7 rights." 365 N.L.R.B. No. 137, at 15; *see supra* note 3 (quoting Section 7, 29 U.S.C. § 157). Among the factors the judge cited for this conclusion were: Rocha questioned Metellus ten days before the representation election; "Metellus recognized Rocha as a supervisor at the facility"; Novato "ran an obvious union opposition campaign around this time period"; and "Rocha offered no explanation for her question nor did she provide assurances against reprisal to Metellus." 365 N.L.R.B. No. 137, at 15. In affirming the ALJ's finding, the Board added that "questions like Rocha's -- going specifically to how an employee himself intends to vote -- have a uniquely coercive tendency," and that "Rocha's position as a high-level management official with no regular working relationship with Metellus compounded the coercive tendency of her question." *Id.* at 2. Moreover, "Rocha's subsequent comments that voting for the Union would have implications on Metellus's pay and that the Union could possibly take part of his paycheck clearly communicated [Novato's] preference that Metellus should vote against representation." *Id.*

"Recognizing the Board's 'competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship,'" *Shamrock Foods*, 346 F.3d at 1137 (citations omitted), we uphold as reasonable its conclusion that Rocha's questioning was sufficiently coercive to

violate the Act. As noted above, the factors cited by the Board are among those upon which it has traditionally relied and support the conclusion here that the interrogation "reasonably tend[ed] to restrain, coerce, or interfere with rights guaranteed by the Act." *Id.* (citation omitted).

Novato further maintains that the Board's finding of an unlawful interrogation violates Novato's free-speech rights under the First Amendment and Section 8(c) of the NLRA. *See* 29 U.S.C. § 158(c) ("The expressing of any views . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit."). Rocha, it insists, simply exercised Novato's First Amendment rights in asking how Metellus planned to vote and merely spoke the truth when she informed him that the union could deduct dues from his paychecks. Novato Br. 25-26.

Novato concedes that it did not raise this objection before the Board and that Section 10(e) of the NLRA deprives this court of jurisdiction to hear any "objection that has not been urged before the Board," barring "extraordinary circumstances." 29 U.S.C. § 160(e). Novato proffers no circumstances, "extraordinary" or otherwise, to excuse its forfeiture. Instead, it insists that free-speech arguments cannot be forfeited and that Section 10(e) simply does not apply to First Amendment arguments. Oral Arg. 7:50; Reply Br. 12-13.

The text of Section 10(e) makes no exception for free-speech objections, whether grounded in the First Amendment or Section 8(c). Nor do this circuit's decisions. *See Ampersand Publ'g, LLC v. NLRB*, No. 15-1074, 2017 WL 1314946, at *2 (D.C. Cir. Mar. 3, 2017) (holding that the "court lacks jurisdiction to consider Ampersand's broad First Amendment argument" because of Section 10(e)'s jurisdictional bar); *Progressive Elec., Inc. v. NLRB*, 453 F.3d 538, 545 (D.C.

Cir. 2006) (declining to hear an employer's Section 8(c) argument because it had "not been raised before the Board"). Nor has Novato cited a single case to support its position. Accordingly, we do not consider this objection.

V

For the foregoing reasons, we deny Novato's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*