RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0149p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ERICKSON TRUCKING SERVICE, INC.,
                    *Petitioner/Cross-Respondent*,

            *v.*                                                        Nos. 18-2283/2380

NATIONAL LABOR RELATIONS BOARD,
                    *Respondent/Cross-Petitioner*.

───────────────

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board;
No. 07-CA-178824.

Argued:  June 25, 2019

Decided and Filed:  July 10, 2019

Before:  SUTTON, BUSH, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:**  Matthew M. O'Rourke, MILLER JOHNSON, Grand Rapids, Michigan, for Petitioner/Cross-Respondent.  Ruth E. Burdick, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.  **ON BRIEF:**  Matthew M. O'Rourke, Keith E. Eastland, MILLER JOHNSON, Grand Rapids, Michigan, for Petitioner/Cross-Respondent. Ruth E. Burdick, David A. Seid, David Habenstreit, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.

───────────────

## OPINION

───────────────

SUTTON, Circuit Judge.  What's down in the well, it's said, comes up in the bucket. The National Labor Relations Board concluded that Erickson Trucking Service, a unionized

crane-rental company in western Michigan, unlawfully fired several employees due to a labor union's activities on their behalf. We agree, most notably because that's how the company explained the matter to the discharged workers.

I.

Erickson Trucking Service, founded in the 1920s and headquartered in Grand Rapids, Michigan, offers cranes for rent. It owns 36 cranes, with lift capacities ranging from 18 to 900 tons. The company sends cranes and crane operators to construction sites across the country, renting its larger, more specialized cranes to projects as far away as Texas and Florida.

Erickson Trucking has used union labor since 1923. It employs 20 members of Local 324, International Union of Operating Engineers, to operate forklifts and cranes. The company is the only unionized company of its kind in western Michigan. According to Steven Erickson, the owner and sole officer since the 1980s, that reality leads to "additional costs that . . . other contractors d[o] not have." J.A. at 146. The company has been "struggling" with declining demand for smaller cranes for a couple of decades, Erickson testified, partly because western Michigan "is being taken over by the non-union sector." J.A. at 116. Erickson wants to invest in larger, specialized cranes with higher rental fees and wider demand.

The company's strong relationship with Local 324 soured in 2015. For the first time, the Local insisted on jurisdictional rigidity—that only members of the Local, not the company's other unions, perform crane-operator work. Then the Local's new business representative, Brandon Popps, requested a mid-term change in their contract. The change would increase wages by 30 to 40%, corresponding to the rate recently negotiated by another area union. The company is contractually bound to pay another union's rates when operators work in its jurisdiction, but Erickson refused Popps' proposal to extend the higher rate to the Local's jurisdiction. In response, the Local threatened to stop referring union members for the company's regular temporary-labor needs.

One other thing happened in 2015. Operators began seeking Popps' help with payroll mix-ups rather than resolving them with Erickson. Wage issues are common at Erickson Trucking due to its payroll's complexity. Under the company's contract with the Local, up to

seven agreements govern crane operators' wages, varying with the location of the jobsite. Each contains six to ten pay scales. Erickson did not take kindly to Popps' sudden involvement in frequent payroll adjustments. When he refused to discuss them with Popps in late 2015—and told employees to "quit talking to Brandon because he's going to get you in trouble"—the Local filed its first-ever grievance and unfair labor practice charge against the company. J.A. at 89.

Erickson eventually agreed to allow workers to seek the Local's help with wages, and they settled the charge in late March 2016. Before that, however, Erickson accused the Local of using "bully tactics" and interfering with payroll "as punishment for not signing a bogus contract." J.A. at 4048. "I would expect that our Union would be better served," he wrote to its leadership, "if the representatives were trying to convert non-union contractors instead of pissing off the longstanding union contractor?" *Id.* Half of the company's crane operators took payroll issues to Popps in 2016.

In mid-2016 Erickson discovered that Popps was approaching the company's customers and encouraging them to hire through the Union's referral process rather than contracting with the company. Erickson cut off all contact with Popps.

From May to July of 2016, Erickson fired six members of the Local as they completed projects—30% of the company's operators. All six of them regularly operated a 40- or 60-ton crane or performed lower-level operator work without an assigned crane. While temporary lay-offs are common due to the seasonal nature of construction work, Erickson had never fired a crane operator before 2016. Erickson told the fired workers about the lack of work for small cranes and stated that he intended to sell all of his smallest cranes. The layoffs "could be reversed," he added, if the workers would "get the Union to back off." J.A. at 79, 85. Erickson put six small cranes on the market.

The Local filed an unfair labor practice charge, claiming that Erickson unlawfully threatened employees based on the union's advocacy, 29 U.S.C. § 158(a)(1), and unlawfully discharged them for the same reason, *id.* § 158(a)(3). An administrative law judge agreed, as did the National Labor Relations Board. The Board petitioned our court for enforcement of its order, and Erickson petitioned for review, contesting only the unlawful discharge claim.

## II.

The National Labor Relations Act bars employers from firing workers based on union activity. 29 U.S.C. § 158(a)(3); *Ctr. Constr. Co. v. NLRB*, 482 F.3d 425, 435 (6th Cir. 2007). A familiar burden-shifting framework applies to unlawful discharge claims. The Board's General Counsel must show that "animus, whether toward the union or an employee's protected conduct," caused the discharge. *NLRB v. Vemco, Inc.*, 989 F.2d 1468, 1476 (6th Cir. 1993); *see NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 404 (1983). Then the burden shifts to the employer to show it would have discharged the employee regardless of animus. *Vemco*, 989 F.2d at 1482.

*Did the General Counsel establish a threshold case?* The General Counsel usually makes its threshold case by establishing the employer's knowledge of individual employees' union activity. *Airgas USA, LCC v. NLRB*, 916 F.3d 555, 561 (6th Cir. 2019). In the alternative, it may show that the employer fired employees to retaliate against the workforce as a whole or to discourage union activity. *Vemco*, 989 F.2d at 1478; *see Novato Healthcare Ctr. v. NLRB*, 916 F.3d 1095, 1105 (D.C. Cir. 2019).

The ALJ concluded that the General Counsel made its threshold showing here. The Board adopted that determination in full as well as all of the factual findings. Substantial evidence supports its conclusion. *See Ctr. Constr. Co.*, 482 F.3d at 433. Following an embattled year with the Local's new leadership, Erickson fired six union members in mid-2016. Erickson felt cornered by a weak market and a newly aggressive Local, and, in his own words, fired the operators to persuade the Local to be more reasonable. Each of the workers testified about Erickson's explanation, and the Board upheld the ALJ's determination that their recollections were more credible that Erickson's. *See Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 967 (6th Cir. 2003).

When Erickson fired Matthew Rowe in May, he explained that he was selling his smaller cranes and work was "drying up," and that he saw no reason to continue employing "unhappy people." J.A. at 68. When Erickson fired Keith Stephenson the same day, he said that "all this union stuff" had "been in the works for a while" and there were "a lot of unhappy people around

here and [Stephenson] seemed unhappy." J.A. at 90. When he fired Carlos Ocampo in July, Erickson said he was discontinuing small cranes *and* that he had to "play by the union rules" and "Brandon is relentless and no one seems to care about that." J.A. at 63.

Another employee asked Erickson that summer if he would be the next to go. Erickson said the 40-ton crane operators would be fired unless "this stuff stops with the Union" and he would "keep letting guys go until I get to the guy I want unless this stuff stops." J.A. at 84. When Erickson fired Jason Baerman, Erin Baerman, and Nick Willer in mid-June, he explained it this way: He was selling the small cranes because the Local was "making things difficult for him to operate." J.A. at 73. Erickson himself testified that Popps caused part of the slowdown in business by "taking the work away from us." J.A. at 154. The Baermans and Willer remembered Erickson saying that the Local was "forcing" him to sell cranes and fire workers, and that he would not "let the Union tell me how to run my business, so I'm going to sell these [40- and 60-ton cranes] and let go of the guys that run them." J.A. at 84. Erickson added "that the new union contract they were trying to shove down his throat was going to get more people let go; the contractors on this side of the state were not going to pay that, and that he was going to make sure he got his contract." J.A. at 74.

But Erickson offered a way out. "[Y]ou guys can make this stop," he told the Baermans and Willer. J.A. at 84. "Brandon and [the Local's leadership] are costing you, your guys' jobs. I've tried talking to them. They won't listen. But maybe if I get rid of you guys, you guys could go talk to them and this could be reversed, and we can go back to doing business like we've done around here for the last 40 years." J.A. at 85.

The Board concluded that several of Erickson's statements violated the National Labor Relations Act's prohibition on threatening employees with discharge due to union activity. 29 U.S.C. § 158(a)(1). The company does not appeal that conclusion. When paired with the reality of the discharges, this finding makes it relatively straightforward to say that the General Counsel permissibly made a threshold showing that the discharges were unlawful.

The company protests that the Baermans and Willer never engaged in union activity by involving the Local, say, in a wage dispute. But the General Counsel need not show that each

discharged employee engaged in protected activity where the employer fired a group in order to discourage union activity in the workforce generally. *Vemco*, 989 F.2d at 1478.

The company persists that this theory was not "fairly litigated" below and the ALJ invoked it on his own. But the General Counsel's complaint fairly alleged that Erickson fired all six operators because they "assisted the [Local] and engaged in concerted activities," *and* because he wanted "to discourage employees from engaging in these activities." J.A. at 3944. The ALJ reasonably concluded that the company fired the operators "due not to any particular union activity on their parts" but instead "to send a message to the Union." J.A. at 16. The parties assuredly litigated that theory before the Board, and substantial evidence supports the Board's conclusion.

*Was Erickson Trucking's justification pretextual?* The company challenges the ALJ's conclusion that its explanation for the discharges—the greater profitability of large cranes, the declining demand for small cranes, and the market-readiness of these operators' cranes in particular—was pretextual. We disagree. The conclusion was a reasonable one on this record.

The credited testimony of the discharged employees about Erickson's contemporaneous explanation undermines the company's version of events. While Erickson told them that he had decided to sell his smaller cranes and that business was slow, he also blamed Popps for "making things difficult for him to operate," and said he would not "let the Union tell me how to run my business." J.A. at 73, 84. Erickson told the employees to "be mad at the Union," as "things didn't have to be this way" but it was "forcing" Erickson to fire people, and "trying to shove" higher wage rates "down his throat" (in a year when his wage rates had already risen). J.A. at 74. Recall that Erickson Trucking is the only unionized crane-rental company in western Michigan and that, according to Erickson's own testimony, the small-crane market has been "taken over" by non-union businesses that charge lower prices. Making matters harder to justify, Erickson said that he would reverse his decision if the Local changed its ways. *See Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 666 (6th Cir. 2005) (contrasting lawfully speeding up a long-planned operational change due to union activity, with unlawfully "suddenly decid[ing] to find a way to cut back . . . to spite the Union"). Complaints about diminished demand for small

cranes ring hollow against such candor—or at least insufficiently true to override the Board's decision.

We also must view this testimony against the backdrop of how the company does business.  It regularly sells aging cranes, perhaps one or two a year but sometimes as many as nine at once.  According to Erickson, he had been transitioning to larger cranes for over a decade at the time of the discharges.  Ten of the 20 cranes the company sold between 2005 and 2016 were small cranes.  Yet until then he had never fired a crane operator.  Not until a few months after the Local sought a new contract, not until the Local became involved in payroll issues for the first time, and not until the Local filed its first unfair labor practice charge did the company fire a crane operator.

Even crediting Erickson's testimony that he happened to decide in the spring of 2016 to exit the small-crane market for unrelated reasons, the need to let go the operators does not necessarily follow.  Many larger cranes require a second operator, a lower-level position known as an oiler, and two of the fired employees were oilers.  The other four were certified to operate larger cranes and, according to Erickson, simply needed more experience.  The company's records also reveal a dramatic increase in temporary hires immediately after the discharges, often for tasks the fired workers usually performed.  In the light cast by this record, the ALJ reasonably concluded that the company's justification was pretextual.

In trying to fend off this conclusion, the company reiterates the economics of the crane market and faults the ALJ's application of the legal standard.  In particular, the company claims that the ALJ gave short shrift to its justification simply because the General Counsel showed anti-union animus, improperly conflating consideration of the threshold case with the company's affirmative defense.  But the ALJ properly dismissed the company's justification as pretextual.  While he credited Erickson's description of market trends and business goals as a general matter, he carefully explained that he did not believe that was the reason these six employees were discharged—in no small part due to what Erickson told the employees.  The company ignores the ALJ's reasoning on that point.  He found that Erickson had one motive, not two, for firing the workers, and the one motive was anti-union animus.  "[A]t that point, there is nothing left to

balance against the impermissible motive," bringing matters to a close. *Temp-Masters, Inc. v. NLRB*, 460 F.3d 684, 693 (6th Cir. 2006).

*Was the Board's remedy a permissible one?* The Board ordered Erickson Trucking to reinstate the employees and to compensate them for their interim expenses in searching for work—remedies subject to considerable deference on appeal, *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 316 (1979), and one of them (reinstatement) expressly authorized by statute, 29 U.S.C. § 160(c). The company claims that it has no work to offer the discharged employees. But that is a more appropriate complaint for the Board's compliance process than for this appeal. As to the award of search-for-work expenses, the company disagrees with the Board's calculation method but offers no explanation why, merely citing a cautionary administrative memorandum that does not bind the Board. The "rule of deference to the Board's choice of remedy" is stricter than that. *Detroit Edison Co.*, 440 U.S. at 316.

We grant the Board's petition for enforcement.